IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ALANA ATHERTON                     )
                                   )
        v.                         )        No. 3:03-1133
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,[1] )


**To: The Honorable John T. Nixon, Senior U.S. District Judge**


REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to § 42 U.S.C. 405(g) to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration denying the

plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI"), as provided by the Social Security Act.

The plaintiff filed an application for DIB on April 5, 1996, alleging disability

beginning January 12, 1995. (Tr. 43-45.) The plaintiff alleged the disabling conditions of

diabetes, high blood pressure due to diabetes, bilateral carpal tunnel syndrome and

tendinitis in her arms and hands. (Tr. 51.) The plaintiff's claim was denied initially and

---

[1]Michael J. Astrue was confirmed by the Senate as the Commissioner of Social
Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, Michael J. Astrue should be substituted for former Commissioner Jo Anne B.
Barnhart as the defendant in this suit.

upon reconsideration. (Tr. 21, 22.) The plaintiff requested and received a hearing in front of Administrative Law Judge ("ALJ") William Bivens on February 20, 1998. (Tr. 360-390, 728-758.) The ALJ issued an unfavorable decision on May 17, 1998. (Tr. 7-18, 716-727.) The plaintiff requested review of the hearing decision. (Tr. 5-6.) The Appeals Council denied the plaintiff's request for review on March 17, 2000. (Tr. 3-4.)

The plaintiff filed a complaint in this Court on May 16, 2000. *See Atherton v. Apfel*, 3:00-0472. Upon the defendant's motion, the Court remanded the case on December 13, 2000, by entry of proposed order submitted by the defendant, to the ALJ to reevaluate the plaintiff's residual functional capacity ("RFC"), consider a sit/stand option, to obtain testimony from a vocational expert ("VE"), and to issue a new decision. (Tr. 437-38.)

In the meantime, on May 12, 2000, the plaintiff filed a new application for DIB and SSI, alleging disability based on diabetes, obesity, rheumatoid arthritis, carpal tunnel syndrome, tendinitis, and high blood pressure. (Tr. 478-81, 677-89.) On July 3, 2000, the plaintiff's May 12, 2000, application was denied. (Tr. 455-456; 690-691.) On August 7, 2000, the plaintiff requested reconsideration of her application. (Tr. 464.) On September 28, 2000, the July 3, 2000, decision was affirmed on reconsideration. (Tr. 457-58; 697-98.) On November 6, 2000, the plaintiff requested a hearing before the ALJ. (Tr. 467.)

In compliance with the December 13, 2000, order of remand, the Appeals Council remanded the case to an ALJ on April 3, 2001. (Tr. 431-32.) A second administrative

2

hearing was held on September 5, 2001, before ALJ Peter C. Edison regarding the April 5, 1996, application and the May 12, 2000, application. (Tr. 409-27.) ALJ Edison issued an unfavorable decision on September 28, 2001. (Tr. 391-400.) The plaintiff then filed a second complaint in this Court on January 14, 2002. *See Atherton v. Social Security Administration*, 3:02-0053. On October 4, 2002, the Court granted the parties' joint motion and entered the parties' joint proposed order of remand, directing the ALJ to address the effects of the plaintiff's obesity on her RFC, to address all opinion evidence of record and give reasons for accepting or rejecting those opinions, and to reassess the plaintiff's subjective complaints. (Tr. 759.) On March 11, 2003, the Appeals Council remanded the case to the ALJ in accordance with the order of remand. (Tr. 760-61.)

The plaintiff received a third hearing, her second before ALJ Edison, on July 21, 2003. (Tr. 827-43.) The ALJ issued a third unfavorable decision on September 8, 2003. (Tr. 701-10.) It is not clear whether the plaintiff sought review by the Appeals Council, but it appears that the parties are in agreement that this September 8, 2003, decision was the final administrative action in the case.


I. BACKGROUND

The plaintiff was born on February 11, 1950, is currently 55 years old, and was 44 years old on January 12, 1995, her alleged onset date. (Tr. 43.) The plaintiff was insured

3

for Disability Insurance Benefits through March 31, 2001. (Tr. 769.) The plaintiff completed high school and attended one year of college. (Tr. 55.) The VE testified at the February 20, 1998, hearing that the plaintiff's past relevant work includes price checker (light, semi-skilled work); stocker (at least medium, unskilled); cashier (light, semi-skilled work); and greeter (light, unskilled work). (Tr. 752.) The plaintiff described an additional category of past relevant work at her September 5, 2001, hearing as a "price control" (Tr. 414-15), which the VE then identified as semi-skilled work (Tr. 424).

The plaintiff first filed for disability in April 1996, alleging disability due to diabetes, high blood pressure, bilateral carpal tunnel syndrome and tendinitis. (Tr. 51-58.) At her last hearing, the ALJ found that the plaintiff had severe impairments including all of the above and obesity.[2] (Tr. 705.)

The plaintiff was first diagnosed with bilateral carpal tunnel syndrome on May 7, 1992. (Tr. 82.) The plaintiff reported worsening pain to her primary care physician, Dr. Michael Davis. (Tr. 117-18.) Dr. Davis excused the plaintiff from work for several days at a time during December of 1994, due to her carpal tunnel (Tr. 314, 311, 310), finally allowing her to return to work in January of 1995, with restrictions of no pushing, pulling or writing for six weeks (Tr. 307).

---

[2]The plaintiff additionally alleged disability due to depression, but the ALJ found that this was not a severe impairment based on the plaintiff's testimony and lack of any history of medical treatment for depression. (Tr. 705.)

4

Dr. Guy Pierret at Hand Surgery Associates, P.C., began treating the plaintiff and, on January 9, 1995, he placed her on work restrictions of "no pricing guns," no lifting over 15 pounds, and temporarily restricted the use of her right hand for approximately one month. (Tr. 181, 178.) Dr. Pierret apparently ceased his treatment of the plaintiff sometime thereafter, stating in an undated letter that he would "no longer be responsible for her work related complaints." (Tr. 152.)

The plaintiff underwent right hand and wrist carpal tunnel release surgery on February 21, 1995. (Tr. 171-72.) Dr. JoAnne Levitan performed the plaintiff's surgery and wrote a series of letters to Kmart, the plaintiff's employer at the time, regarding the plaintiff's progress. Dr. Levitan consistently reported good progress, return of sensation, absence of numbness and decreased pain from February through April of 1995. (Tr. 589, 587, 584, 581.) Due to her positive results, the plaintiff decided to undergo surgery on the left side as well, and Dr. Levitan performed a left carpal tunnel release on May 5, 1995. (Tr. 163-64.) The left side surgery went well, but the plaintiff began to experience returning pain on the right side soon thereafter. (Tr. 578.) On July 31, 1995, Dr. Levitan reported that the plaintiff was complaining of pain in her arms and shoulders and that she could return to work but needed restricted, light work, lifting nothing over five pounds, avoiding use of the ticket gun, and no more than three hours at the register per day. (Tr. 186, 575.) On September 25, 1995, Dr. Levitan changed the plaintiff's work restrictions to consist of light

5

use of both hands, no lifting over five pounds, and no more than four consecutive days of work.[3]  (Tr. 185.)  Dr. Levitan excused the plaintiff from work on October 2, 1995, due to pain, citing the plaintiff's extensive tendinitis and wrist pain.  (Tr. 558, 561.)

Beginning in October 1995, Dr. Davis excused the plaintiff from work several times, extending through January 3, 1996.  (Tr. 290, 286, 285, 284, 278, 275-76.)  Dr. Levitan again wrote to Kmart on November 6, 1995, informing them that the plaintiff experienced swelling and aching, had moderate-severe carpal tunnel on the left with borderline carpal tunnel on the right that had improved, and a good range of motion.  (Tr. 554-55.) Dr. Levitan opined that the plaintiff's diabetes might be contributing to her nerve problems in her hands, that the plaintiff was obese, and stated that she had referred the plaintiff to Dr. Joseph Meerschaert, a physiatrist, for pain management.  *Id.*  On January 2, 1996, Dr. Meerschaert wrote to Kmart, stating that the plaintiff could return to work with the restriction of a sit/stand option.  (Tr. 76-77, 351-52.)  Later that month, Dr. Meerschaert opined that the plaintiff should stay on restricted work duties, and she should also be allowed to elevate her arm.  (Tr. 353.)  Dr. Levitan discharged the plaintiff on March 7,

---

[3]The Court notes that its copy of the transcript reads, "Avoid more than 4 consecutive days in a [illegible]."  (Tr. 185.)  Because it is not unreasonable to assume that the omitted word should cause the phrase to read "days in a *row*," and both the plaintiff and the defendant complete the phrase in this way, the Court assumes that the phrase actually reads, "4 consecutive days in a row."

6

1996, stating that the plaintiff "could" work, but deferring to Dr. Meerschaert's limitations. (Tr. 551-52.)

On April 5, 1996, the plaintiff filed her original DIB application. For the remainder of 1996, the plaintiff continued to see Dr. Meerschaert, who noted that the plaintiff was experiencing severe pain in her arms and having trouble with diabetes. (Tr. 100.) Dr. Meerschaert excused the plaintiff from returning to work on several occasions (Tr. 99, 98), advised her to avoid aggravating factors, and finally ordered that she remain off work for the next three months in December 1996 (Tr. 600). During this time, the SSA found the plaintiff "not disabled" on July 12, 1996 (Tr. 21) and, on reconsideration, the denial of her claim was affirmed on April 8, 1997 (Tr. 22).

On June 27, 1997, Dr. Meerschaert noted that the plaintiff's pain continued and that he believed that it was permanent. (Tr. 347.) On December 12, 1997, Dr. Meerschaert wrote a letter detailing the plaintiff's continuing trouble with pain in her arms, hands, and shoulders, as well as her struggles with diabetes and obesity, and stated that the plaintiff was "totally and permanently disabled." (Tr. 346.) Dr. Meerschaert wrote a much shorter (one sentence) letter on February 17, 1998, to reiterate that the plaintiff was "100% totally and permanently disabled, and unable to have any form of gainful employment." (Tr. 356, 656.)

7

Dr. Nii Saban Quao began treating the plaintiff in November 1997. (Tr. 635.) Dr. Quao treated the plaintiff for a variety of complaints between November 1997, and August 2000. (Tr. 618-35.) During this time, Dr. Quao repeatedly noted diagnoses of diabetes myelitis II, obesity, hypertension, insomnia, bilateral carpal tunnel syndrome, degenerative joint disease (DJD), and a chronic sinus condition. (Tr. 618-35.)

The plaintiff's first administrative hearing was held on February 20, 1998, before ALJ Bivens. (Tr. 360-90, 728-58.) The ALJ's decision dated May 17, 1998, was unfavorable, and the plaintiff requested review. (Tr. 7-9, 5.) Upon reconsideration, the previous finding of "not disabled" was affirmed by the Appeals Council on March 17, 2000. (Tr. 3.) During this time, Dr. Meerschaert continued to treat the plaintiff, noting significant arm and shoulder pain on May 14, 1998. (Tr. 599.) On November 24, 1998, Dr. Meerschaert reported electromyographic examination (EMG) test results showing bilateral mild to moderate carpal tunnel syndrome. (Tr. 597.)

The plaintiff began seeing Dr. Kenneth Bartholomew in May 1999. (Tr. 615-616.) Dr. Bartholomew treated the plaintiff's persistent pain with medication, and noted that her condition improved in response to the medications. (Tr. 614, 613.) On June 8, 1999, Dr. Bartholomew filled in a Department of Human Services form indicating medical problems of "degenerative and rheumatoid arthritis," expected to be permanent. (Tr. 657.)

The plaintiff filed a new application for DIB on April 4, 2000, followed closely by an application for SSI dated April 7, 2000. (Tr. 478-81, 677-89.) On June 22, 2000, Dr. Johnson of Tennessee DDS examined the plaintiff and concluded that she should avoid repetitive wrist work, continue to see a doctor, and that her work should not exceed any restrictions placed on her by her treating physicians. (Tr. 609-11.) On July 3, 2000, the SSA issued a determination of "not disabled." (Tr. 455-56, 690-91.)

Dr. Quao completed a Tennessee Department of Human Services form dated July 3, 2000, which listed diagnoses of "rheumatoid arthritis and diabetes," with restrictions of "unable to walk more than 50 ft.," "extreme fatigue and carpal tunnel syndrome," and "complications of diabetes," all of which were expected to be permanent. (Tr. 658.) Dr. Quao saw the plaintiff for an office visit on July 17, 2000, and listed diagnoses of diabetes myelitis II, a puncture wound on the right index finger, and hyperlipidemia (elevation of lipids/cholesterol in the bloodstream). (Tr. 618.)

Dr. Janina Meissner-Frisk, D.O., provided medical records for the plaintiff dated from October 20, 2000 to October 19, 2001. (Tr. 665-70; 776-80.) During this time, Dr. Meissner-Frisk treated the plaintiff for a variety of ailments, including toe fungus, insomnia, diabetes, hypertension, allergies, hyperlipidemia, fatigue, edema, and weight gain. *Id.*

9

A second administrative hearing was held before ALJ Edison on September 5, 2001. (Tr. 409-27.) ALJ Edison issued an unfavorable decision on September 28, 2001. (Tr. 391-400.)

The plaintiff apparently resumed treatment with Dr. Quao around November 9, 2001. (Tr. 803.) Dr. Quao saw the plaintiff intermittently between late 2001 and February 2003. (Tr. 782-803.) The plaintiff's most frequent complaints during this time, according to Dr. Quao's treatment notes, were lethargy, uncontrolled diabetes myelitis II, bilateral carpal tunnel syndrome, insomnia, hypertension, depression, anxiety, weight gain, and ulcers and cellulitis in her legs. *See id.* At her last documented visit on February 25, 2003, Dr. Quao noted that the plaintiff complained of hand pain and swelling in her leg. (Tr. 782.) He listed her diagnoses as lethargy, vascular insufficiency, HCVD (hypertensive cardiovascular disease), uncontrolled diabetes myelitis II, and bilateral carpal tunnel syndrome. *Id.*

On July 21, 2003, a third administrative hearing was held before ALJ Edison, and an unfavorable decision issued on September 8, 2003. (Tr. 827-43, 701-10.)

The ALJ made the following determinations:

1.      The claimant met the insured status requirements of the Act as of the alleged onset date. Her DLI was March 31, 2001.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset date.

10

3.      The claimant has "severe" impairments including carpal tunnel syndrome, tendonitis, obesity, hypertension, and diabetes.

4.      The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, and Appendix 1.

5.      The claimant's allegations of pain and functional limitations are not fully credible for the reasons discussed above.

6.      The claimant retains the residual functional capacity to perform light work with no repetitive gripping/grasping.

7.      The claimant cannot perform any past relevant work, per vocational expert testimony.

8.      The claimant is age 53 now, 51 at DLI, 44 at AOD.

9.      The claimant has 14 years of education.

10.     The transferability of any acquired work skills is not a material issue.

11.     The framework of Rule 202.14/202.15 of the Medical-Vocational Guidelines and VE testimony demonstrate that the claimant has the residual functional capacity to perform jobs that exist in significant numbers in the regional economy.

12.     The claimant is not disabled within the meaning of the Act.

(Tr. 709.)


## II.  DISCUSSION

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is

supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001)

12

(citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of

13

impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

In addition, the plaintiff must show that she became disabled prior to the expiration of her insured status. 42 U.S.C.A. § 423(a) and (c). "When one loses insured status, one is simply no longer eligible for benefits for disability arising thereafter." *Henley v. Comm'r of Soc. Sec.*, 58 F.3d 210, 213 (6th Cir. 1995) (citing *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)).

Third, if the plaintiff is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

14

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[4] *Id. See also Tyra v. Sec'y of*

---

[4]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

*Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances). In this case, the ALJ resolved the plaintiff's case at step five of the inquiry. The ALJ found, *inter alia*, that even though the plaintiff was unable to perform past relevant work, the plaintiff has the residual functional capacity to perform jobs that exist in significant numbers in the regional economy. (Tr. 709.)

The plaintiff asserts three grounds for reversal. The plaintiff alleges that the ALJ erred by (1) failing to abide by the October 4, 2002, order of remand; (2) failing to give proper consideration to the plaintiff's treating physicians; and (3) failing to include all of the plaintiff's limitations in his RFC finding.[5] The plaintiff seeks a reversal of the Commissioner's decision and an award of benefits, rather than remand.

---

[5]Because the order of remand directed the ALJ to address the opinion evidence of record and give reasons, the plaintiff's second argument is addressed under the general heading of her first argument that the ALJ failed to follow the order of remand.

16

**A.  The ALJ followed the October 4, 2002, order of remand.**

This case began in April 1996, when the plaintiff filed her original DIB application. (Tr. 43-45.)  She filed subsequent applications in April 2000 for both DIB and SSI.  (Tr. 478-81, 677-89.)  She has been denied each time, both initially and upon reconsideration. (Tr. 21, 22-25, 455-56, 690-91, 457-58, 697-98.)  The plaintiff has also filed two prior actions in this Court in May 2000, and January 2002.  *See* Nos. 3:00-0472 and 3:02-0053.  The case has been remanded twice: first on September 5, 2001, and again on October 4, 2002. (Tr. 437-38, 759.)  There have been three separate hearings before the ALJ on February 20, 1998 (Tr. 360-90, 728-58), September 5, 2001 (Tr. 409-27), and July 21, 2003 (Tr. 827-43).

The October 4, 2002, order of remand instructed the ALJ to do three specific things:

1.    address the effects, if any, that Plaintiff's obesity has on her residual functioning capacity (RFC),

2.    address all of the opinion evidence of record and give specific reasons for rejecting or accepting treating source opinions, as well as explaining the reasons for the weight given all opinion evidence of record, and

3.    reassess Plaintiff's subjective complaints in accordance with the pertinent regulations and rulings.[6]

(Tr. 759.)

---

[6]The plaintiff does not argue that she had subjective complaints that should have been taken into account.  Instead, the plaintiff focuses only on the bending and stooping restriction in addressing her third assertion of error.

In a conscientious effort to comply with the order of remand, the ALJ addressed these three issues specifically in his third decision dated September 8, 2003. (Tr. 701-10.) It is significant that the second and third hearings were both conducted before ALJ Edison. When determining whether the ALJ properly followed the order of remand, both the second and third hearing transcripts, exhibits, and decisions must be considered. When the second and third decisions are considered in conjunction with each other, it is clear that the ALJ complied with the order of remand, that substantial evidence supports his conclusions, and that the decision should be upheld.

**1. The ALJ addressed the plaintiff's obesity in evaluating her RFC.**

Residual functional capacity is defined as what a plaintiff can still do despite factors such as "impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [a plaintiff] can do in a work setting." 20 C.F.R. § 404.1545(a). The responsibility rests with the ALJ to determine a plaintiff's RFC in cases when the ALJ conducts a hearing. § 404.1546. In terms of physical exertion requirements, jobs are classified as sedentary, light, medium, heavy, and very heavy. § 404.1567.

Under the relevant regulations, obesity is no longer a "listed" impairment. However, the effects of obesity must be considered in evaluating other impairments.

18

64 Fed. Reg. 46122-01, 1999 WL 637689 (Aug. 24, 1999). The ALJ followed the relevant law and regulations in evaluating the effects of the plaintiff's obesity.

The ALJ found that the plaintiff's obesity was a severe impairment in both the September 28, 2001, decision ("2001 decision") and the September 8, 2003, decision ("2003 decision"). (Tr. 395, 705.) In the 2001 decision, however, the ALJ did not specifically reference the plaintiff's obesity or resulting limitations when he assigned her RFC. The ALJ noted that the plaintiff was obese according to the medical records in evidence, and he further stated that the plaintiff would probably benefit from weight reduction. (Tr. 397, 398.) The ALJ did not find any credible evidence that the plaintiff's obesity resulted in any limitations, such as a sit/stand option, nor did he credit obesity as the cause of her back and leg pain. *Id.*

In contrast, in the 2003 decision, the ALJ specifically addressed the plaintiff's obesity when he discussed the medical records and assessments of Drs. Meissner-Frisk and Quao.[7] (Tr. 706, 707.) Most significantly, when assigning the plaintiff's RFC, the ALJ explicitly took the plaintiff's obese condition into consideration. The ALJ stated that he was "giving the claimant the benefit of the doubt" with respect to her obese condition. (Tr. 707.) The ALJ found that though some DDS consultants evaluated the plaintiff as capable of a full

_____

[7]The ALJ indicated that Dr. Meissner-Frisk's treatment notes state that the plaintiff was referred to a dietician, and Dr. Quao notes that the plaintiff was morbidly obese at 353 pounds in December 2001, and 372 pounds in 2003. (Tr. 706-07.)

range of medium work, "*in view of her massive obesity*, [the plaintiff] probably could not do the necessary bending and stooping to perform this work." *Id.* (emphasis added.) Due to her obese condition, the ALJ assessed the plaintiff's appropriate RFC as light work with an additional restriction of no repetitive gripping/grasping. *Id.*

The ALJ followed the instructions in the order of remand by specifically taking the plaintiff's obesity into account when assigning an RFC. It is the ALJ's responsibility to evaluate the evidence of record and assign an appropriate RFC. In this case, the ALJ explicitly stated he was taking the plaintiff's obesity into account and assigned a more restrictive RFC. The contrast between the 2001 decision and the 2003 decision clearly illustrates the ALJ's conscientious compliance with the order of remand with respect to the plaintiff's obesity.

### 2. The ALJ gave proper consideration to the Plaintiff's treating physicians.

Second, the order of remand directed the ALJ to consider the opinion evidence of record and give specific reasons for rejecting or accepting treating source opinions. The ALJ must address the medical evidence of record and "give reasons" for accepting or rejecting the various opinions. Because the ALJ was the same for both the 2001 and 2003 hearings and decisions, and because the order of remand was based on the deficiencies in the 2001 decision, reference to both decisions is appropriate.

20

The ALJ did give reasons for accepting or rejecting *some* of the medical opinions of record in his September 28, 2001, decision. (Tr. 391-400.) The ALJ stated that he gave substantial weight to Dr. Johnson's June 22, 2000, opinion (Tr. 609-11) regarding the plaintiff's functional abilities because it was "well-supported and . . . consistent with the record as a whole." (Tr. 397.) The ALJ gave little weight to Dr. Meerschaert's February 17, 1998, letter (Tr. 656) in which he opined that the plaintiff was totally disabled. (Tr. 397.) The ALJ accorded Dr. Meerschaert's opinion less weight, citing its inconsistency with his own treatment notes and the objective medical evidence of record, and the fact that Dr. Meerschaert was no longer the plaintiff's treating physician and had not seen the plaintiff recently. *Id.* The ALJ further noted that Dr. Meissner-Frisk, the plaintiff's current physician, declined to submit a medical assessment, and that the plaintiff apparently "dismissed" Dr. Quao as her treating physician. *Id.*

The order of remand did not specifically enumerate which opinions the ALJ failed to address in his 2001 decision and/or the opinions the ALJ was directed to address on remand, but merely restated the general "treating source" rule. The Social Security Administration follows a "treating source" rule. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998). Social Security regulations require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R.§ 404.1527(d)(2). Medical opinions are defined by 20 C.F.R. §§ 404.1527(a) and 416.927(a) as opinions about

21

the nature and severity of an individual's impairment(s) and they are the only opinions that may be entitled to controlling weight. Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *2. Such opinions must be "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and "not inconsistent" with the other "substantial evidence" in the individual's case record. *Id.* If the Secretary rejects the opinion of a treating physician, he must articulate a reason for doing so. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

The plaintiff argues that the ALJ did an "exceedingly inadequate job" of addressing the "innumerable opinions" in the record. Docket Entry No. 11, at 9. Contrary to this assertion, however, the plaintiff only references *three* opinions that should have been considered. Although the plaintiff argues that the ALJ should have addressed "all three assessments raised at the administrative hearing," she specifically discusses just two opinions in her brief: Dr. Levitan's September 25, 1995, assessment (Tr. 185), and Dr. Meerschaert's medical source statement of December 2, 1997 (Tr. 174-76). At the hearing, however, the plaintiff's counsel specifically questioned the VE about Dr. Levitan's assessment, Dr. Meerschaert's statement, and Dr. Quao's DDS form dated July 3, 2000 (Tr. 658). (Tr. 842.) For reasons discussed below, the ALJ properly considered these opinions. Each of the three opinions cited by the plaintiff is a fill-in-the-blank/check-the-box form. In both the Third and Eighth Circuits, it is well-settled that such forms are due little weight. *See, e.g., Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("form reports

Case 3:03-cv-01133   Document 21   Filed 04/22/08   Page 22 of 31 PageID #: 30

in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best"); and *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983) ("while these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole").  This Court agrees that such forms, while admissible, may be properly given little weight.  As indicated in *Mason*, such forms impose little burden on the physician to be thorough.  994 F.2d at 1065.  Furthermore, as addressed in *O'Leary*, the interpretive problems posed by these types of forms are a significant impediment to their usefulness.  710 F.2d at 1341.  A physician may check "lifting/carry affected" but this does not illuminate either the plaintiff's condition or the resulting limitations in a satisfactory manner.  The ultimate decision of determining disability as defined by the Social Security Act rests with the ALJ.  The ALJ cannot base an informed decision solely on a check in a box.  Thus, it was proper to give these forms little weight.

### a.  Dr. Meerschaert

The plaintiff first discusses the assessment by Dr. Meerschaert dated December 2, 1997. (Tr. 174-76.)  This assessment is a form SSA-1151, consisting of three pages of fill-in-the-blank and check-the-box options.  *Id.*  Dr. Meerschaert indicated that the plaintiff's lifting/carrying was affected to the extent that the plaintiff could lift/carry up to five pounds occasionally and less than five pounds frequently.  (Tr. 174.)  He checked "yes"

under the question "Are LIFTING/CARRYING affected by impairment?" but noted only "obesity & back & leg pain," rather than filling in the blanks describing how many hours in an eight hour day were affected. *Id.* Dr. Meerschaert did not indicate a sitting impairment, and checked off that the plaintiff could balance occasionally and never climb or stoop. He did not mark any kneeling or crouching restrictions. (Tr. 175.) Dr. Meerschaert indicated that reaching, handling, feeling, and pushing/pulling were affected by the impairment (but did not say how), and that seeing, hearing and speaking were not. *Id.* Finally, in the space for explanations of other impairments and medical findings, Dr. Meerschaert hand wrote: "Diabetes with obesity, Sect 9.09[8] 66" tall 318 lbs, over 100% > ideal wt., also severe bilat. carpal tunnel." (Tr. 176.)

In the 2001 decision, the ALJ focused his analysis of the medical evidence submitted by Dr. Meerschaert in a letter dated later in time than the December 1997 form here at issue. The ALJ stated that he "give[s] little weight to Dr. Meershert's [sic] opinion that the claimant is totally disabled," referencing Exhibit B-10F, a letter dated February 17, 1998 (Tr. 656). (Tr. 397.) The ALJ rejected this letter because it was inconsistent with the doctor's treatment notes and the objective medical evidence of record. *Id.* The ALJ explained that

_____

[8] Dr. Meerschaert's notation about Section 9.09 was undoubtedly a reference to listing 9.09, which dealt with obesity. This listing was deleted in 1999 because "the criteria in listing 9.09 were not appropriate indicators of listing-level severity because they did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." 64 C.F.R. 46122-01, 1999 WL 637689 at *1.

an example of this inconsistency is found at Exhibit 13F, where Dr. Meerschaert does not restrict the claimant in sitting. *Id.* Exhibit 13F is the December 2, 1997, medical assessment form that the plaintiff claims the ALJ did not consider. (Tr. 2, 174-76.) Clearly, the ALJ examined the December 1997 form when he analyzed the February 1998 letter. Although the ALJ primarily addressed the February 1998 letter in his analysis, this was appropriate because the February 1998 letter was later in time, and evidently drew upon the earlier medical records, including the December 1997 form. Because the ALJ considered the 1997 form in his 2001 decision, it was proper for the ALJ not to revisit the 1997 form in depth in his later 2003 decision. The ALJ did address the February 1998 letter again in the 2003 decision, and reiterated his conclusion that it had "little if any merit." (Tr. 707.) Given his earlier analysis, in addition to evidence that the ALJ did in fact revisit the medical records of Dr. Meerschaert in his 2003 decision, there is substantial evidence that the ALJ properly considered, weighed, and gave reasons for giving little weight to the medical assessments of Dr. Meerschaert.

### b. Dr. Levitan

Second, the plaintiff asserts that it was error for the ALJ to fail to address Dr. Levitan's September 25, 1995, assessment (Tr. 185) in his 2003 decision. It is true that Dr. Levitan was a treating specialist who performed the plaintiff's carpal tunnel surgeries.

However, those surgeries occurred in the year 1995, eight years prior to the date of decision. Additionally, the September 1995 form in question was merely one in a series of forms completed by Dr. Levitan during the course of the plaintiff's treatment and recovery from her carpal tunnel surgery. In fact, Dr. Levitan released the plaintiff to return to work in October 1995, just two months after imposing the 4-day limitation.[9] (Tr. 558, 561.) In a letter dated October 2, 1995, Dr. Levitan stated that the plaintiff was showing some improvement from her surgery, was responding to injections and oral pain medications, and that she would be returning to work the following day.[10] *Id*. Dr. Levitan made no mention of any restrictions that should be imposed, including the prior significant prohibition on working more than four days in a row. It is reasonable to assume that the four consecutive day limitation was a temporary restriction, lifted when Dr. Levitan cleared the plaintiff to return to work with follow-ups only as needed. (Tr. 561.) The record contains several more letters from Dr. Levitan, none of which references a four day limitation, despite the fact that she does impose other restrictions. (Tr. 554-55, 76-77, 351-52, 551-52.) Significantly, Dr. Levitan said that she thought the plaintiff "could work" and discharged the plaintiff from her care. (Tr. 552.)

_____

[9]*See supra*, n.3.

[10]The pages of Dr. Levitan's October 2, 1995, letter are out of order in the record. The letter is two pages long, clearly labeled, and found on pages 558 and 561, as indicated.

It is not reasonable to demand that the ALJ take one fill-in-the-blank form out of a series and credit it as a stand-alone assessment in making a determination of disability eight years later. It is clear that the ALJ evaluated the medical records of Dr. Levitan in making his decision in 2001. He discussed the plaintiff's surgery, resulting limitations, and cited the medical records of Dr. Levitan in discussing the plaintiff's condition. (Tr. 396, 398.) The ALJ found that the plaintiff experiences "residual problems" from the 1995 carpal tunnel surgery performed by Dr. Levitan and that "this has been taken into account in assigning her residual functional capacity." (Tr. 398.) Therefore, it is clear that the ALJ considered and at least partially credited the opinions and records of Dr. Levitan in making his 2001 decision. Again, as with the assessment of Dr. Meerschaert, because it was addressed in the 2001 decision, it can hardly be one of the opinions that was not addressed in 2001 that formed the basis of the order of remand. The ALJ properly considered the records and opinions of Dr. Levitan, and it was not error for him to fail to mechanically list each and every scrap of medical evidence submitted in each decision he issued, particularly since it is clear that such evidence was previously evaluated and credited.

The plaintiff argues that the ALJ should have singled out the September 1995 Dr. Levitan form simply because it was mentioned at the administrative hearing. *See* Docket Entry No. 11 at 11. However, the plaintiff takes the 1995 form out of context since it represented only a "snapshot" of the plaintiff's condition during her period of recovery.

27

Indeed, Dr. Levitan herself removed, or at least failed to renew, the restriction a mere two months after it was imposed in 1995. Therefore, it was not error for the ALJ to fail to credit the form or the VE's testimony based on the contents thereof.

### c. Dr. Quao

Despite the fact that the plaintiff makes no specific arguments regarding the opinion of Dr. Quao, because the plaintiff argues that it was error for the ALJ to fail to consider the opinion evidence addressed by the plaintiff's counsel during the administrative hearing, the Court will also address the ALJ's treatment of Dr. Quao's July 3, 2000, opinion. (Tr. 658.)

On July 3, 2000, Dr. Quao completed a Tennessee Department of Human Services form diagnosing the plaintiff with rheumatoid arthritis and diabetes, and listing the following restrictions: unable to walk more than fifty feet, extreme fatigue and carpal tunnel syndrome, and complications of diabetes. (Tr. 658.) In the blank for "estimated time client will be exempted due to this condition," Dr. Quao filled in "permanent." *Id.* The ALJ specifically addressed the medical evidence submitted by Dr. Quao in both his 2001 and 2003 decisions. In his 2003 decision, the ALJ explained:

> I do not accept the treating source opinions especially that by Dr. Quao. They are not supported and express diagnoses and limitations based on subjective complaints that are not justified by the objective medical evidence

of record. . . . She does not have any positive evidence of rheumatoid
arthritis.

(Tr. 707.) Thus, the Court finds that the ALJ considered and gave reasons for rejecting the

opinion of Dr. Quao. The ALJ first found the records inconsistent, and then pointed to the

specific example that, despite Dr. Quao's fill-in-the-blank diagnosis of rheumatoid arthritis,

there is no objective support for such a diagnosis in Dr. Quao's own medical records.[11] The

ALJ sufficiently addressed Dr. Quao's medical opinion, and he clearly stated his reasons

for rejecting it.

In sum, the ALJ properly addressed the relevant medical opinion evidence of record.

The plaintiff has not shown that any pertinent medical evidence was overlooked or

improperly considered. Even at step five of the sequential evaluation process, it remains

the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391.

The plaintiff has failed to prove that her functional limitations were so severe as to prevent

her from performing some range of work. While it is always preferable for the ALJ to be

as specific as possible in his discussion and analysis of the medical opinion evidence of

---

[11]On the plaintiff's November 9, 2001, office visit, Dr. Quao listed "rheumatoid
arthritis" as a diagnosis along with "DMII" (diabetes). (Tr. 803.) The Court found this one
scribbled reference only after an exhaustive review of Dr. Quao's handwritten treatment
notes. There are no other references to rheumatoid arthritis in any of the previous or later
records, nor apparently any treatments specifically prescribed, nor most importantly,
limitations imposed as a result of this condition. Despite this one notation, there remains
substantial evidence to support the ALJ's decision not to fully credit the opinions of
Dr. Quao.

record, the Court cannot find that the ALJ failed to comply with the order of remand, that his decision was not supported by substantial evidence, or that the ALJ committed any other reversible error.

### B. The ALJ did not err in failing to include all of the plaintiff's limitations in his RFC finding.

The plaintiff asserts that the ALJ only "minimally" addressed the effects of the plaintiff's obesity, and should have further evaluated the plaintiff's difficulty bending and stooping. As discussed more fully in Section II(A)(1), above, the ALJ did take the plaintiff's obesity into account when assigning her RFC. The ALJ acknowledged that an obese person might have some difficulty bending and stooping, and, for this reason, did not accept the opinion of Dr. Johnson that she was capable of performing medium work. Her bending and stooping limitation was the reason the ALJ assigned a more restrictive RFC for *light* work. It is well-settled that medium work activity requires "frequent bending-stooping" while light work requires some lifting "with occasional, rather than frequent, stooping." SSR 83-10 at *6. It was entirely appropriate for the ALJ to shift his RFC assessment from medium to light based on a bending and stooping limitation.

The plaintiff now argues that her RFC should be lowered further based on her obesity and the resulting difficulties of bending and stooping, which have already been taken into account. The ALJ explicitly found that the plaintiff's obesity would cause

trouble bending and stooping, and lowered her RFC accordingly. There is no reason to remand this case for still further evaluation of the bending and stooping limitation. The hypothetical question to the VE was proper, because it was based on a person performing at the light level of exertion, which was already a concession to the plaintiff's obesity and specifically to the bending and stooping limitation.

## III. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 10) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

31